IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| FREDERICK DEWAYNE MALONE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:13-CV-718-O |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Frederick Dewayne Malone, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against William Stephens, Director of TDCJ, Respondent. The prior referral to the Magistrate Judge is withdrawn. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

## I. BACKGROUND

On October 10, 2008, in the 396th District Court of Tarrant County, Texas, a jury found Petitioner guilty of capital murder, and, the state having waived the death penalty, he was sentenced to life without parole. Clerk's R., vol. 2, J. of Conviction 326, ECF No. 15-9. The Second District Court of Appeals of Texas summarized the factual background of the case as follows:

> Mrs. Eloida Marin testified that on December 21, 2006, she and her husband, Antonio, arrived in Fort Worth to visit with their son, Ruben, and his family. On December 30, after 8:00 p.m., Mrs. Marin, Antonio, Ruben, and Ruben's two children were sitting in the living room when Mrs. Marin heard a knock on the door. Ruben got up to answer the door. He did not see anyone through the peephole. He

opened the door about six inches, and then two young African-Americans slammed it open and forced him to the floor. Mrs. Marin described the men as each having "a little bit of beard" and stated that one was tall and the other one was short. She clarified her earlier testimony about the two men slamming the door open, explaining that the short one had come in first and had taken Ruben to the ground. The tall one had pointed a gun at her husband and her. By this time, she and her husband had stood up. Mrs. Marin testified that the first shot occurred when the short man shot Ruben; the tall man was pointing his gun at her husband and her. Her husband moved to help Ruben, and then the tall man shot her husband. But neither Mrs. Marin nor her husband realized that he had been shot until the paramedics had removed Ruben from the apartment. The paramedics took both men to the hospital, where Antonio later died.

Mrs. Marin testified that she did not identify the two intruders from a photo spread. In court, she tentatively identified Appellant as the person who had shot her husband, stating that she was not sure.

On cross-examination, Mrs. Marin indicated that she had initially told the police that the short person had shot both her husband and her son. She also admitted when asked, "And do you remember indicating or telling Ms. Reyes that you thought maybe the tall one shot your husband, but then you later told Ms. Reyes that you didn't see who shot your husband because you were nervous and your eyes were on your son?", that "[she] always ha[d] said that, [but had] recalled very well that the taller one shot [her] husband."

Ruben Marin testified that on December 30, he arrived home about 8:00 or 8:30 p.m. He had more than $1,000 in his wallet. He was sitting on the love seat close to the front door, talking with his parents and children, when he heard a knock on the door. He looked through the peephole and saw an unfamiliar African-American man. Ruben then opened the front door about three or four inches to see what the stranger wanted. The stranger tried to get into the apartment. Ruben tried to close the door, but the stranger put his foot down and wedged his hand in to prevent the door from closing. Ruben recalled that the stranger had a medium-sized black revolver in his hand. Ruben tried to take the gun away from the stranger. Ruben testified that they struggled for the gun but that he let go when he realized that his children were nearby. Ruben testified that during the struggle, he noticed that another unfamiliar African-American man had come in and had moved toward his parents. Ruben testified that the second man had a silver gun, like a square, and that the second man pointed the gun at the elderly Marins. Ruben testified that when the second man came in, the first man shot Ruben in the side. The first man then ripped Ruben's left pocket, removing a magazine, and took Ruben's wallet from his right pocket. Ruben's dad moved closer to Ruben to help him, and then Ruben heard but did not see another shot. The second intruder was beside Ruben's dad, and the first

intruder was still behind Ruben, near the front door, when Ruben heard the shot. Ruben testified that the second man was taller than the first, with a fuller face, and that the second man had a shaved head.

Detective Billy W. Randolph testified that a few days after the Marin robbery, he began to suspect Desmond Brooks, a resident of Ruben Marin's apartment complex who had committed a robbery earlier in December. Detective Randolph testified that Desmond Brooks was about five feet, six inches tall or five feet, seven inches tall and weighed about 160 pounds. Detective Jose Hernandez testified that Brooks was five feet, seven inches tall and weighed 140 pounds. The police arrested Brooks on outstanding warrants and interviewed him for several hours. Detective Randolph testified that during the Brooks interview, Appellant's name came up (the detective testified that Brooks said that Appellant was his next-door neighbor), and Brooks also told the police where to find evidence of the Marin robbery.

Officer Bill Yeager testified that he participated in the search of Apartment 229 at Ruben's apartment complex and collected two weapons, ammunition, and personal effects. Relying on information gleaned from the Brooks interview, the police found one of the weapons, a firearm, in a sock in a laundry basket in the bedroom closet. Officer Yeager also found a wallet in the air conditioning unit. At trial, Detective John Livesay identified the firearm found in the sock, State's Exhibit 37, as a .22 caliber revolver, and he identified the wallet as Ruben's.

Detective Livesay searched the car of Brooks's girlfriend. He found receipts showing that Appellant rented Apartment 228, the apartment next to Brooks's, which Detective Livesay confirmed with the apartment's management. Officer Yeager also searched Apartment 228.

Appellant was subsequently arrested for the Marin robbery in Austin County. Detectives Hernandez, Livesay, and Randolph went to that county to interview Appellant, who Randolph testified was about six feet, two inches tall and weighed about 175 pounds. All three detectives identified Appellant at trial. During the interview, which was recorded, Appellant admitted to knowing that his cousin, Brooks, was going to rob someone, agreeing to be Brooks's driver, entering the apartment with a gun at his side, and ushering the two wounded men and the elderly woman into the bathroom after the robbery and shootings. He denied shooting anyone and claimed that he had purchased the .22 recovered upon his arrest from Brooks after the robbery. He also stated that he was a psychopath, saw a psychiatrist, and was on Trazadone and Restidol. The interview took place in the wee hours of the morning, and Appellant yawned occasionally during the two-three hour interview.

After the interview, Detective Randolph took custody of Appellant's possessions and personal effects with which he had been arrested, including a pistol

3

that was sealed in a bag.  Detective Randolph did not open the bag.  Detective Livesay testified that the pistol recovered from Appellant was a .22 caliber.

In comparing the .22 caliber pistol found at Brooks's apartment and the .22 caliber pistol recovered when Appellant was arrested, Detective Livesay testified that Appellant's gun had a longer barrel (four inches) and a nine-shot capacity.  The revolver found in Brooks's apartment had about a two-and-a-half-inch barrel. Michael Ward, senior forensic scientist in the firearms and tool mark unit of the Fort Worth Police Department's crime laboratory, testified that the bullet recovered from the elder Mr. Marin's body, State's Exhibit 31C, had been fired from State's Exhibit 52, the .22 seized upon Appellant's arrest.  Ward also testified that the same bullet was not fired from State's Exhibit 50, the .22 retrieved from Brooks's apartment.

A jailhouse informant also testified that Appellant admitted to participating in the crime, but the informant's report of some of the details of the offense, such as the location of the bullet wounds on the Marin men, differed from the forensic evidence admitted at trial.

Mem. Op. 2-7, ECF No. 13-5.

The appellate court affirmed the trial's court judgment, and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review.  *Id.* 16; Electronic R., ECF No. 13-1. Petitioner also filed a state habeas application challenging his conviction, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court.  Appl. for Writ of Habeas Corpus, cover, ECF No. 17-6.  This petition for federal habeas relief followed.

## II.  ISSUES

Generally, Petitioner raises the following grounds for habeas relief:  ineffective assistance of counsel (ground one); prosecutorial misconduct (ground two); trial-court error (grounds three, five, and six); insufficiency of the evidence (grounds four and eight); and, improper arrest warrant (ground 7).  Pet. & Attach. 6-25., ECF No. 1.[1]

---

[1]The pages of the attachment to the petition are not paginated, therefore the pagination in the ECF header is followed.

## III.  RULE 5 STATEMENT

Respondent believes that the petition is neither barred by the statute of limitations nor successive and that the claims have been properly exhausted.  Resp't's Ans. 8, ECF No. 18.

## IV.  DISCUSSION

### A.  Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA).  28 U.S.C. § 2254.  Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court.  28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 131 S. Ct. 770, 785 (2011).  This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings."  *Harrington,* 131 S. Ct. at 786.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings.  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.  A petitioner has the burden of rebutting the presumption of correctness by clear-and-convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, as in this case, it is an adjudication on the merits, which is also entitled to the presumption of correctness.  *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999);

5

*Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[2]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

### B. Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. Const. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. The Supreme Court recently emphasized in *Harrington v. Richter* the way that a federal court is to consider an ineffective assistance of counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland*

---

[2]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

6

claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

131 S. Ct. at 785 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000) (emphasis in original)).

Accordingly, it is necessary only to determine whether the state courts' adjudication of petitioner's ineffective assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

At trial, Petitioner was represented by J. Warren St. John and Daniel Young. Petitioner claims counsel were ineffective by failing to: (a) subpoena and call Roderick Brown and Garfield Thompson as defense witnesses; (b) object to the fact that Detective Hernandez forged Petitioner's signature on the *Miranda* warnings card without Petitioner's consent or knowledge; (c) object to Mrs. Marin's in-court identification of Petitioner as the person who shot her husband; (d) properly object to the state's withholding of exculpatory evidence, a composite sketch, the display of the sketch, and the prosecutor's remark that the sketch looks like Petitioner during closing argument; (e) object to inadmissible hearsay testimony by Detective Hernandez regarding statements made to him by Brooks and his girlfriend; (f) raise or explain any alleged police "trickery" during the suppression hearing; (g) investigate the state "informer's" "mental medical records" to see if he had any "mental problems"; and (h) present DNA evidence at trial to show scratches on Desmond Brooks's neck were made while fighting with Rubin Marin. Pet. & Attach. 6, 13-17, ECF No. 1; Pet'r's Mem. 3-13.

Counsel St. John, an experienced criminal defense attorney, responded to Petitioner's allegations as follows:

> On September 30, 2011, FREDERICK MALONE filed an Application for Post-Conviction Writ of Habeas Corpus. The petition alleges that I was ineffective in my representation of him. I submit that I was effective and state the following to show that Mr. Malone was competently and effectively represented.

I.

### HISTORY OF THE CASE

> The following summary is intended to provide a brief overview of the trial testimony.

> The record indicates that on December 30, 2006, Frederick Malone and his cousin, Desmond Brooks, pushed their way into the apartment of Ruben Marin where he and his parents were. His parents, Eloida Marin and Antonio Marin had come to Fort Worth to visit their son and their grandchildren from El Paso, Texas.

> The record shows that Malone and Brooks were both armed with handguns. The evidence indicates that during the course of the robbery, that either Brooks or Malone shot Ruben Marin. As Ruben Marin laid on the floor, his elderly father Antonio Marin came to his aid.

> The record indicates that as Antonio attempted to help his son, that Malone shot the father, Antonio Marin. Mr. Marin died shortly thereafter at John Peter Smith Hospital in Fort Worth. Desmond Brooks took Ruben Marin's wallet out of his back pocket. Mr. Marin had a substantial amount of cash in his wallet.

> Fort Worth Police searched Desmond Brooks' apartment and found Ruben Marin's wallet minus the cash. Detectives developed Malone as a suspect along with Brooks. Malone was arrested in Sealy, Texas on a warrant. Mr. Malone was interviewed by detectives in Sealy, Texas and gave about a two and a half to three hour statement. Mr. Malone was on medication at the time of his interview. Mr. Malone was transported back to Fort Worth and later housed in the Tarrant County Jail.

> The record also indicates that Brooks recruited a man who was know[n] as "Black" to assist in the robbery of the Marin's [sic].

8

II.

<u>RESPONSE TO APPLICANT'S GROUNDS FOR RELIEF</u>

In *Craig v. State,* 825 S.W.2d 128 (1992), the Court stated that in Texas, we follow two standards in order to gauge the effectiveness of counsel.

(1)    (a)    In the guilt-innocence phase of trial in capital and non-capital cases, the *Strickland v. Washington* (466 U.S. 668) test is the proper standard to gauge the effectiveness of counsel. In the punishment phase of trial in capital murder cases, the *Strickland v. Washington* is the proper standard to gauge effectiveness of counsel.

(2)    In the punishment phase of non-capital cases in Texas, the *Ex Parte Duffy,* Tex. Cr., 607 S.W.2d 507 (1980) test is the proper test. *See also Valencia v. State,* ___ S.W.2d ___ (Tex. Cr. App. No. 0049-95, June 4, 1997) WL 297713.

As stated in *Craig v. State,* supra, *"Strickland* requires a two-part analysis; (1) did the attorney's performance fail to constitute 'reasonably effective assistance,' i.e., did the defense attorney's representation fall below an objective standard of reasonableness under professional norms, and (2) if so, was there a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."

Actually, the *Ex parte Duffy* test is the same test previously utilized by the Federal Fifth Circuit as announced in *McKenna v. Ellis,* CA-5, 280 F.2d 592 and followed by *King v. Beto,* CA-5, 429 F.2d 221. The Fifth Circuit held that effective counsel does not mean errorless counsel, but counsel reasonably likely to render and rendering reasonably effective assistance. *Ex parte Duffy* follows this same credo somewhat in its application.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court held that the 6th Amendment right to counsel is the right to "effective assistance of counsel," and this applies to the punishment procedure as well as the actual trial on the issue of guilt. (*Strickland* is not applicable to a penalty phase.) The defendant must, to obtain reversal for ineffective assistance of counsel, show that (1) his counsel's performance was deficient, and (2) this deficiency was such as to deprive the defendant of a fair trial.

9

III.
RESPONSE TO FAILURE TO PROPERLY AND
EFFECTIVELY REPRESENT THE DEFENDANT

I was appointed to represent Mr. Malone as co-counsel with Dan Young on January 24, 2007. I met with Mr. Malone in the jail, as well as co-counsel and our private investigator. An independent investigation was conducted regarding the facts of the case. All of the discovery was reviewed with Mr. Malone.

I met with co-counsel and our investigators on or about September 30, 2008. We investigated the scene of the capital murder offense (a home invasion robbery) as well as the scenes of the extraneous aggravated robberies pending against Mr. Malone. I also reviewed about 17 CDs worth of discovery. Through the first week of October, I focused on reviewing all the material we had. Specifically, one area of focus was to review Mr. Malone's video-recorded statement to the police, the original transcript of the recorded statement, and to have both edited several times to make sure that extraneous, irrelevant, and prejudicial portions were not put before the jury during the State's case-in-chief. The edited statement was introduced at trial after the court, in a pre-trial suppression hearing, ruled that the statement was admissible subject to editing.

**Response to Ground One: Counsel Was Ineffective for Failure to Subpoena Witness**

To the best of my recollection Mr. Malone never mentioned a Roderick Brown, nor why Mr. Brown would be important to the case. I do not believe that such a name was ever brought up to me, and such a name appears nowhere in my notes. As noted above, Mr. Malone brought up the name of Derrick Thompson, not Garfield Thompson that he mentions in his writ. I explained to Mr. Malone that the testimony would likely be hearsay, and if admitted would possibly open a can of worms without offering any real benefit to the defense in light of the various evidence that was continuing to mount against him, including evidence in the capital murder case and the extraneous aggravated, home invasion type robberies. Part of the evidence included not only the fact that Mr. Malone was caught with what proved to be the murder weapon when he was arrested, but also included his 2-3 hour statement to the police in which he admitted to participating with Brooks in the robbery leading to the capital murder. In the statement he claimed to be carrying a .38 at the time and further claimed that he did not remember firing a shot. The evidence related to the extraneous robberies also indicated that Mr. Malone and Brooks participated in a number of other previous robberies in Tarrant County, were caught together on video while Brooks pawned an item traced to at least one of the robberies, and that at the time of the capital murder the two lived in adjacent apartments in an apartment complex next to the complex where the capital murder

10

occurred.  The evidence produced by the State did indicate that Brooks, the first to be arrested in the capital murder, denied shooting anyone, but he did tell the police during one of the interviews that there were two .22s involved.  Mr. Malone did have the fatal .22 on his person at the time of his arrest.

To my knowledge, there was simply no evidence to support Mr. Malone's claim that Brooks was trying to set him up in revenge for Brook's belief that Malone had killed Brook's [sic] younger brother.  The evidence indicated that the two were partners in an extended crime spree.  I did not think it good strategy to defend Mr. Malone on a capital murder charge with the defense that Brooks thought he had committed a prior murder, especially in light of the State's evidence and the possibility, no matter how slim, that the defense may reach a punishment portion of the case.

**Response to B:  Counsel Was Ineffective for Failing to Object to Detective Hernandez's Signing Applicant's Name on the Miranda Card**
**Response to G: Counsel Failed to Bring Up Police Trickery Regarding the Suppression of Applicant's Statement**

I did object at the pre-trial suppression hearing on the statement that the statement was not voluntary and that Mr. Malone did not appreciate or comprehend his 38.22 warnings as reflected, in part, by his not personally signing his Miranda warning card.  As best as I remember, Det. Hernandez never testified that Applicant's name on the Miranda Card was Applicant's signature, but, rather that he placed Applicant's name on the card to show that Applicant had indeed been given his statutory warnings.  The court found that the video recorded statement that the court had reviewed in its entirety complied with all the requirements for admissibility under the statute, that all present were clearly identified on the recording and that on the recording Applicant was fully apprised of his statutory warnings.  Defense argued to the court that the statement was involuntary because of the time of night the interview was conducted, because of the medication Mr. Malone was on, because of Mr. Malone's yawning several times on the video, and that such involuntariness was emphasized by Det. Hernandez placing Applicant's name on the card.  The court simply overruled the defense's argument.

There never was an issue that the Det. forged Applicant's signature on the card.  Likewise, the video recorded interview shows that Applicant was questioned hard, but there was never an issue from any source that Applicant was tricked into making a statement or that he was in anyway [sic] unconscious.  Although the defense attacked the voluntariness of Applicant's statement, the court simply did not agree and found that Applicant knew what was going on and that he was lucid.  The best rebuttal to Applicant's claim is the recording itself.

**Response to C: Trial Counsel's Failure to Object to Mrs. Marin's In-Court Identification of Applicant.**

Mrs. Marin was a sympathetic witness since she and her husband were from out of town and were visiting her son and his two children (who were also present at the time of the robbery and shooting) for the Christmas holidays. Nevertheless, she was crossed on her inconsistent statements and the inconsistencies were argued to the jury.

Mrs. Marin, wife of Antonio Marin who was shot and later died and mother of Ruben Marin who was shot and survived, indicated at trial, to the best of my recollection, that she believed Applicant shot her husband. She was crossed on the fact that she originally told the police she was not sure who shot whom, but that she thought that the shorter of the two intruders, who would have been Brooks, shot both her son and her husband. She also gave a statement after returning home (but before trial) that she thought the taller of the two, who would have been Applicant, shot her husband. At the time of the initial investigation, she could not identify anyone.

Mrs. Marin was not going to change her testimony on the stand. She was too sympathetic to try to punish on the stand. The most effective way of handling her was to cross her with her inconsistencies and let her go.

**Response to D: Counsel's Failure to Properly Object to a Composite Sketch During Argument**

I do not remember the incident to which Applicant refers in detail, nor do I remember whether the composite sketch of which Applicant complains was introduced into evidence during trial. Applicant's complaint seems to be that the State improperly showed the jury during final argument a composite sketch developed during the investigation of the case that was not admitted into evidence, and that counsel objected to such display on the wrong grounds. I am fairly certain from reviewing my trial notes that Det. Hernandez testified to meeting with Ruben Marin while Mr. Marin was still in the hospital recovering from his gun shot and having Mr. Marin work with a sketch artist to formulate a composite sketch of one of the unidentified intruders. The sketch did bear some semblance to Applicant, but it was by no means conclusive as to identification.

**Response to E: Counsel's Failure to Investigate Informant's Medical Records**

The informant was Mr. Malone's cell mate and testified to incriminating statements that Mr. Malone made to him, including Applicant's allegedly telling him that Applicant shot both victims. There was never a reason to believe that the informant gave untruthful testimony due to mental illness or impariment. Pre-trial,

the State shared a transcript of its interview with the informant.  He gave details that could have only come from one connected with or involved in the offense. Moreover, the informant passed a polygraph exam, the informant was truthful about reporting that Applicant told him he needed to get someone to kill the surviving son, that Applicant and Brooks did commit the robbery, and that Applicant was the one who shot both the father and the son.  The informant may or may not have been lying, but he gave no indication of mental impairment.

**Response to F: Counsel's Failure to Object to Hearsay Statements from Detective Hernandez**

To the best of my recollection, Detective Hernandez never testified as to what Brooks or Brooks'[s] wife told him in any detail.  He did not present hearsay statements by either of the two witnesses and there was on violation of a right to confront the two witnesses.  At most, Hernandez testified that his interviews with the witnesses led him to Applicant as a suspect in the capital murder case.

**Response to G: See Response to B Above.**

**Response to H: Counsel Failed to Argue DNA Evidence**

The DNA evidence failed to link either Applicant or Brooks to the scene, thus, it was a non-issue in the case.  Applicant, however, in his statement put himself at the scene.  He also admits to being at the scene and in the apartment where the robbery/murder occurred in his "Memorandum" in support of his writ.  Moreover, counsel believes that the failure to link Applicant to the scene through DNA was argued to the jury; it just did not overcome his statement wherein he admitted to being in the apartment with Brooks.

Mr. Malone was kept informed about the strategies of his case at all times.

When representing a client, my goal is always to achieve the best possible result with his or her direction, which is exactly what I did with Mr. Malone's case. All course of conduct was strategically designed to benefit my client.

Appl. for Writ of Habeas Corpus, Att'y Aff., 182-91, ECF No. 17-9 (citations to the record omitted).

Counsel Young also responded to Petitioner's allegations by affidavit as follows:

**Overview of Counsel's Pre-Trial Preparation**

I was appointed to represent Frederick Malone on or about January 11, 2007. The day I was appointed, I drove to the Mansfield Jail to interview Mr. Malone, to

advise him of the charges against him (capital murder), to advise him not to talk to anyone (law enforcement or other inmates regarding the charges), and to obtain what information Mr. Malone could convey regarding the charges. At the initial interview, Mr. Malone informed me that [he] had given no statement when he was arrested on the capital murder in Sealy, Texas about one week earlier. This proved to be totally untrue. Mr. Malone also denied any involvement in the capital murder for which he was arrested. Mr. Malone also told me that his cousin and co-defendant in the capital murder, Desmond Brooks, told some "celly" of Malone's in the Mansfield Jail that Brooks was the shooter and was not going to let Mr. Malone take the rap, but Mr. Malone could not provide the name or a good description of the celly.

Over the next two weeks I communicated with Mr. Malone's mother by phone and conducted two more jail visits with Mr. Malone on January 21, 2007 and January 24, 2007 at the Tarrant County Jail. During the interview on January 21, 2007, Mr. Malone said that after I visited him the first time at Mansfield, an inmate in his pod at Mansfield claimed that Brooks was bragging about shooting two men on the west-side (the general area of the capital murder). Mr. Malone gave me the name of the inmate, Derrick Thomas, who claimed to have sold drugs to Brooks and who was supposedly willing to give a statement that Brooks was going to pin everything on Malone. At this point, Mr. Malone had denied ever giving a statement to the police upon his arrest and had denied any involvement in the capital murder for which he was arrested. Indeed, Mr. Malone told me that Brooks ran a robbery ring with the help of Brooks' wife, and that one of the people involved in the robbery ring looked like Mr. Malone. Malone implicated Derrick Thomas in several of the numerous robberies supposedly committed by Brooks. At the interview on January 24, 2007, Mr. Malone conceded that he did talk to a Fort Worth Detective who came to interview him in Sealy, TX upon his arrest. Mr. Malone claimed that the detective wanted him to admit that he was the person who shot the gun in the capital murder-robbery, but that he denied the shooting.

In the meantime, the Hon. Warren St. John was appointed first-chair (on or before January 24, 2007) because the State indicated it would be seeking the death penalty.

Much of my pre-trial work was devoted to obtaining records from numerous institutions (local as well as institutions scattered across central Texas) in search of the client's medical and mental history, family history, prison history, etc. in an effort to document any mitigation evidence that may be uncovered. I also coordinated having material reviewed by a forensic psychologist that was appointed to help in reviewing records and elaborating any possible mitigation evidence if the State insisted on seeking the death penalty. During the pre-trial period, the State continued to file numerous (about seven) additional aggravated robbery cases against Mr. Malone, a majority of which involved home invasion robberies similar to the capital

14

murder with which he was charged.  I visited Mr. Malone periodically throughout the pre-trial period, usually to obtain authorizations for release of records and to maintain contact with him.  Occasionally we would discuss his cases, but my primary focus was in gathering information for a possible mitigation case.  The State did not decide until late in the case, when the prosecution was taken over by a new D.A., the Honorable Sheila Wynn, to waive the death penalty.  On or about April 30, 2008, co-counsel and I did meet with Mr. Malone for an extended period of time where we went over in detail the State's case against him.  The review lasted approximately 3-4 hours.

As we got closer to trial, I met with co-counsel and our investigators on or about September 30, 2008.  We investigated the scene of the capital murder offense (a home invasion robbery) as well as the scenes of the extraneous aggravated robberies pending against Mr. Malone.  I also copied and reviewed about 17 CDs worth of discovery obtained from Mr. St. John.  Through the first week of October, I focused on reviewing all the material we had.  Specifically, one area of focus was to review Mr. Malone's video-recorded statement to the police, the original transcript of the recorded statement, and to have both edited several times to make sure that extraneous, irrelevant, and prejudicial portions were not put before the jury during the State's case-in-chief.  The edited statement was introduced at trial after the court, in a pre-trial suppression hearing, ruled that the statement was admissible subject to editing.[3]

. . .

*Id.* 192-201, ECF No. 17-9.

The state habeas judge, who also presided at trial, found counsel's affidavits credible, and supported by the record, and entered findings, too numerous to list, consistent with the affidavits, which were later adopted by the Texas Court of Criminal Appeals.  *Id.* 257-65, ECF No. 17-9. Based on its findings, and applying the *Strickland* standard, and other relevant state and Supreme Court case law, the state habeas court concluded that counsel adequately and independently investigated Petitioner's case, fully and adequately prepared for Petitioner's trial, fully and adequately litigated the admissibility of Petitioner's video-recorded statement, made proper and

---

[3]The remainder of Young's responses to Petitioner's allegations are identical, or nearly identical, to St. John's responses set forth above and are not repeated.

necessary objections, and functioned as counsel guaranteed by the Sixth Amendment. *Id.* 266-67, ECF No. 17-9. The court further concluded that Petitioner had failed to demonstrate a reasonable probability that, but for the alleged acts of misconduct, the result of his trial would have been different and listed the following evidence undercutting any likelihood of a different outcome with other counsel or if counsel had represented Petitioner in another manner:

a. On December 30, 2006, two men perpetrate a home invasion robbery of Marin family apartment.

b. The shorter man took Ruben Marin to the ground while the taller man pointed a gun at Antonio and Eloida Marin.

c. The shorter man shot Ruben Marin.

d. When Antonio Marin knelt down to help his son, the taller man fatally shot him.

e. Eloida Marin tentatively identified the applicant as the taller man who shot her husband.

f. The police began suspecting Desmond Brooks while investigating him for another home invasion.

g. Brooks told the police about the applicant's participation in the Marin home invasion.

h. The Marins lived about 100 to 150 yards from the applicant and Brooks.

I. The police recovered Ruben Marin's wallet and credit card from Brooks' apartment.

j. When the police arrested the applicant, he had a pistol in his possession.

k. The bullet recovered from Antonio Marin's body came from the applicant's pistol.

l. The applicant admitted participating in the Marin home invasion.

m. Brooks is a shorter man - 5'6" or 5'7".

16

n.      The applicant is a taller man - 6'2".

*Id.* 264-65, 267, ECF No. 17-9.

Absent clear and convincing evidence in rebuttal, the Court defers to the state court's factual findings.  Applying the appropriate deference and having independently reviewed Petitioner's claims in conjunction with the state court records, it appears that the Supreme Court has not specifically addressed one or more of the claims raised by Petitioner or that, where the Supreme Court has done so, the state court's application of *Strickland* was reasonable.  Petitioner's claims are conclusory, with no legal and/or evidentiary basis, refuted by the record, involve state evidentiary rulings or other matters of state law, or involve strategic and tactical decisions made by counsel, all of which generally do not entitle a state Petitioner to federal habeas relief.[4]  Furthermore, even if Petitioner could demonstrate defective assistance based on one or more of his claims, he has not made a showing of *Strickland* prejudice.  *Strickland,* 466 U.S. at 694-96.  Petitioner is not entitled to relief under his first ground.

---

[4]*See, e.g., Lopez v. Smith,* — U.S. —, 135 S. Ct. 1, 3 (2014) (providing absent a decision by the Supreme Court addressing "the specific question presented by a case" a federal court cannot reject a state court's assessment of claim); *Burt v. Titlow,* — U.S. —, 134 S. Ct. 10, 17 (2013) (noting the absence of evidence cannot overcome the presumption that counsel's conduct fell within wide range of reasonable professional assistance); *Gonzalez v. United States,* 553 U.S. 242, 249 (2008) (providing tactical decisions generally controlled by counsel include "the arguments to advance"); *Strickland,* 460 U.S. at 691 (providing strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for post-conviction relief on grounds of ineffective assistance of counsel); *Alvord v. Wainwright,* 469 U.S. 956, 960 n.5 (1984) (providing decision on what witnesses to call is "the exclusive province of the lawyer"); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002), *cert. denied,* 538 U.S. 926 (2003) (providing counsel is not required to make  frivolous or futile motions or objections); *Wilkerson v. Cain,* 233 F.3d 886, 892-93 (5th Cir. 2000) (providing decisions regarding presentation of evidence is a question of trial strategy); *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *United States v. Green,* 882 F.2d 999, 1003 (5th Cir. 1989) (providing "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial"); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain").

### C.  Prosecutorial Misconduct

Under his second ground, Petitioner claims the state prosecutor improperly withheld a composite sketch of one of the suspects, exhibited the sketch to the jury during closing argument, and commented that the sketch looked like Petitioner.   Petitioner argues that by doing so the prosecutor injected new facts not admitted into evidence "into the jury['s] mind."  Pet. & Attach. 6, 17-18, ECF No. 1.  The record reflects that the defense introduced the sketch into evidence; thus, clearly the defense was aware of the sketch.  Reporter's R., vol. 7, 57-58, ECF No. 13-12 & vol. 8, Def.'s Ex. No. 5, 88,[5] ECF No. 14-7.  Further, the record reflects that the trial court sustained the defense's objection to the prosecutor's remark and gave a curative instruction to the jury but denied Petitioner's motion for a mistrial.  Appl. for Writ of Habeas Corpus 268-69, ECF No. 17-9.  Relying only on state case law, the Second Court of Appeals addressed this claim in the context of trial-court error as follows:

> When a trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court abused its discretion in denying the mistrial.  Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, that is, "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required.  In determining whether a trial court abused its discretion in denying a mistrial, we balance three factors:  (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct. Given the trial court's prompt instruction to disregard the prosecutor's comment, Appellant's confession, and the ballistics match between his .22 and the bullet taken from Antonio Marin's body, we cannot conclude that the trial court abused its discretion by denying a mistrial.

*Id.* 332-33, ECF No. 17-10 (footnotes and citations omitted).

In addition, the state habeas court, noting that the Tarrant County District Attorney's Office

---

[5]The pages of the exhibit volume of the reporter's record are not paginated, therefore the pagination in the ECF header is followed.

maintains an open-file policy, found that the sketch had been added to the file on August 2, 2007, over two months before trial, as "part of the chronology of events" in the case, that the defense therefore had access to the sketch before trial, and, moreover, that Detective Hernandez testified about the sketch during the suppression hearing on September 3, 2008, over a month before trial. *Id.* 268, ECF No. 17-9.  The court therefore concluded that no *Brady* violation occurred and that the prosecutor's comment did not rise to the level of prosecutorial misconduct or result in a prejudicial effect on the jury's verdict.  *Id.* 269-70, ECF No. 17-9.

The state court's adjudication of the issue is neither contrary to Supreme Court law nor unreasonable in light of the evidence before the court.  A *Brady* violation does not occur where, as here, the information is known to the defense before trial.  *West v. Johnson,* 92 F.3d 1385, 1399 (5th Cir. 1996), *cert. denied,* 520 U.S. 1242 (1997).  Additionally, whatever prejudice resulted from the prosecutor's comment during closing argument was cured by the prompt curative instructions. *Weeks v. Angelone,* 528 U.S. 225, 234 (2000) (providing a jury is presumed to follow its instructions).  Petitioner is not entitled to relief under his second ground.

### D.  Trial-Court Error

Under his third ground, Petitioner claims the trial court erred by overruling his motion to suppress his oral statement because it violated article 38.22 of the Texas Code of Criminal Procedure and his right to due process under the state and federal constitutions.  Pet. & Attach. 7, 18-19, ECF No. 1; TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2013).  Petitioner bases his claim on allegations that (1) Detective Hernandez signed his name on the Miranda card without his permission, (2) Detective Hernandez committed forgery by doing so, and (3) he was under the influence of "mental illness medication" that made his dizzy and drowsy at the time of the

19

interrogation.  He asserts then that his statement was the result of trickery–"a calculated practice which all agents of the state present knew was reasonably likely to evoke an incrimination response from" him–and his medication.  Pet. Attach., ECF No. 1.  Applying article 38.22 and relevant state case law, the Second Court of Appeals addressed the issue as follows:

> Appellant contends that the trial court erred by denying his motion to suppress his oral statement taken in violation of article 38.22 of the code of criminal procedure, claiming that he did not understand the warnings under article 38.22, that he would not have given a statement had he understood that he could terminate the interview, that he was on medication that prohibited him from understanding the interview process, and that his will was overborne.  He also contends that "[t]he officer used a method to induce . . . [him] to give a statement that was in violation of the due process clause of the State and Federal Constitutions" and that the statement was involuntary, violating Article 38.21.

> Article 38.21 of the code of criminal procedure provides that "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed."  Article 38.22, section three of the code of criminal procedure provides,

> (a) No oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

>> (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

>> (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

>> (3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

>> (4) all voices on the recording are identified; and

>> (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

(b) Every electronic recording of any statement made by an accused during a custodial interrogation must be preserved until such time as the defendant's conviction for any offense relating thereto is final, all direct appeals therefrom are exhausted, or the prosecution of such offenses is barred by law.

. . .

(e) The courts of this state shall strictly construe Subsection (a) of this section and may not interpret Subsection (a) as making admissible a statement unless all requirements of the subsection have been satisfied by the state, except that:

(1) only voices that are material are identified; and

(2) the accused was given the warning in Subsection (a) of Section 2 above or its fully effective equivalent.

Appellant does not provide any specific arguments or analysis to support his contentions, nor does he point to any specific violations of these statutes.

The trial court found that

- Appellant was "advised of the statutory warnings as required by Article 38.22 . . . [and that he] freely, voluntarily, intelligently, and knowingly waived those rights and agreed to answer questions";

- Appellant never requested to have a lawyer present or to terminate the interview;

- "the Court was not convinced that [Appellant's yawning] had anything to do with any type of inability to comprehend what was going on"; and

- Appellant "was lucid throughout the interview and was able to address and to answer questions or respond in an appropriate manner to the questions."

The trial court concluded as a matter of law that all the requirements of article 38.22 had been met.

Our review of Appellant's statement[] shows that it was taken in compliance with articles 38.21 and 38.22 as well as the state and federal constitutions. Appellant was Mirandized, and his statement was recorded. All speakers were identified. Appellant told the questioning officers that he was on Trazadone and Restidol, that he was a psychopath, that he saw a psychiatrist, and that the medicine helped him relax. He also yawned occasionally during the interview, which was taken in the early morning hours. But nothing in our review of his statement, or the other

21

evidence in the record, for that matter, raises an issue of any incompetence of Appellant or any failure by him to understand the interview proceedings. Further, while we note that the officers used permissible trickery, deceit, and other persuasive techniques in their questioning of defendant, our review of the recorded interview does not show that any of their actions appear calculated to produce an untruthful confession or one that is offensive to due process, and Appellant does not otherwise point to any such actions. We cannot conclude that his will was overborne. Based on the applicable standard of review, we hold that the trial court properly denied Appellant's motion to suppress.

Mem. Op. 9-13, ECF No. 15-1 (footnotes & citations omitted).

Federal habeas proceedings are limited to reviewing questions of federal law. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). It is well settled that federal habeas corpus relief does not lie for errors of state statutory, case or constitutional law. *Id.* Thus, federal courts are not authorized to determine whether the state courts have misinterpreted the state's own laws. *Charles v. Thaler,* 629 F.3d 494, 500-01 (5th Cir. 2011). A claim that a Texas court failed to properly apply Article 38.22 of the Texas Code of Criminal Procedure or adjudicate a state-constitutional question does not raise a question of federal law and is not subject to federal habeas review. *See Amador v. Quarterman,* 458 F.3d 397, 412 (5th Cir. 2006) ("The prejudice inquiry in this case turns on a question of Texas state law: whether the statement was in fact admissible under Article 38.22"); *Evans v. McCotter,* 790 F.2d 1232, 1238 n.6 (5th Cir.1986) ("Regardless of whether the statement was properly admitted as a matter of the Texas [Code of Criminal Procedure Article 38.22], the alleged error must violate the *federal* constitution or *federal* laws for the writ to be granted.") (citations omitted).

As a federal constitutional matter, the test for determining the voluntariness of a statement is to ask what effect the totality of the circumstances had upon the will of the defendant. *Withrow v. Williams,* 507 US. 680, 693 (1993); *Arizona v. Fulminante,* 499 U.S. 279, 285 (1991). There is

no evidence supporting Petitioner's allegations that Detective Hernandez signed the Miranda warnings in Petitioner's name or forged Petitioner's signature on the document, that Petitioner's medication rendered him unable to understand the warnings or resulted in a false confession, or that the detectives employed tactics likely to result in an involuntary confession.  Trickery or deceit is only prohibited to the extent it deprives a suspect "of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine,* 475 U.S. 412, 424 (1986).  The transcript of Petitioner's interview and Detective Hernandez's testimony at the suppression hearing reflect that the interview took place in the early morning hours and lasted nearly three hours, that Petitioner was advised of and waived his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), that Petitioner was lucid and feeling "physically okay," that Petitioner neither asked for nor was deprived of refreshment or additional sleep, that Petitioner took medication that made him dizzy or drowsy, although nothing suggests Petitioner had taken his medication at or near the time of his statement, that the detectives may have deceived Petitioner about certain aspects of their investigation, and that Detective Hernandez may have raised his voice on several occasions. Reporter's R., vol. 8, Def.'s Ex. 3, ECF Nos. 14-6 & 14-7; Reporter's R., vol. 2, 39, 48-50, ECF No. 13-7.  There is no indication that Petitioner was in a debilitated or helpless condition or that his statement involved coercion or inducement on the part of the detectives such that his "will was overborne" by the circumstances of the interrogation.  *Miranda,* 384 U.S. at 476; *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973).  In short, the state court's adjudication of the claim is neither contrary to, or an unreasonable application of, Supreme Court precedent or unreasonable in light of the evidence before the court.

Similarly, under his sixth ground, Petitioner claims the trial court erred by admitting his

statement over his Rule 403 objection. Pet. Attach. 20-22, ECF No. 1. The Second Court of

Appeals addressed the claim as follows:

> Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its
> probative value is substantially outweighed by the danger of unfair prejudice,
> confusion of the issues, or misleading the jury, or by considerations of undue delay,
> or needless presentation of cumulative evidence." A trial court is not required to
> perform a balancing test in a formal hearing on the record. Given the inability of the
> Marins to positively identify Appellant as one of the robbers and the risk that the
> jailhouse informant's mangling of some of the details of the offense as compared to
> the forensic testimony could have made him appear less than credible to the jury, as
> could the fact that he was allowed to plead to a lesser offense in an unrelated case in
> exchange for his testimony against Appellant, Appellant's statement was highly
> probative and was crucial to the State's case. Further, as we held above, Appellant
> does not point to any improper actions by the officers in taking his statement.
> Accordingly, the trial court could have properly decided that the probative value of
> Appellant's statement was not substantially outweighed by the danger of unfair
> prejudice.

Adm. R., Mem. Op. 13-14, ECF No. 13-5.

It is not the province of a federal habeas court to reexamine state court determinations on

state law questions such as the admissibility of evidence under state procedural rules. As a general

rule, a state court's evidentiary rulings present cognizable habeas claims only if they violate a

specific constitutional right or are so egregious as to render the entire trial fundamentally unfair as

a matter of due process. *Johnson v. Puckett,* 176 F.3d 809, 820 (5th Cir. 1999); *Mullen v.*

*Blackburn,* 808 F.2d 1143, 1145 (5th Cir. 1987). Petitioner has demonstrated neither requirement.

The trial court's decision was in accordance with state law, and, in any event, admission of the

evidence was not so egregious that it makes the outcome of Petitioner's trial fundamentally unfair.

Finally, under his fifth ground, Petitioner claims the trial court erred by admitting the

testimony of the jailhouse informant, Robert Clower. Pet. Attach., ECF No. 1. Petitioner raised this

evidentiary claim for the first time in his state habeas application, and the state habeas court

24

expressly found that the claim was not cognizable on writ of habeas corpus under state law. Admin. R., Conclusions of Law 276-77, ECF No. 17-9. Federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Coleman v. Thompson,* 501 U.S. 722, 729 (1991); *Amos v. Scott,* 61 F.3d 333, 338 (5th Cir. 1995). To overcome the state procedural bar, a petitioner must demonstrate either cause for the procedural default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750. The "fundamental miscarriage of justice" exception is reserved for cases of actual innocence, where the petitioner shows, as a factual matter, that he did not commit the offense for which he was convicted. *Finley v. Johnson,* 243 F.3d 215, 222-23 (5th Cir. 2001). Petitioner shows neither cause for failing to raise this claim on direct appeal nor proof of actual innocence. Therefore, this claim raised for the first time in his state habeas application is procedurally barred from this Court's review. Petitioner is not entitled to relief under his third, fifth or sixth grounds.

### E.  Sufficiency of the Evidence

Under grounds four and eight, Petitioner claims the evidence was insufficient to prove he was a party to the offense and used a firearm. Pet. & Attach. 7, 19, 24, ECF No. 1. Petitioner contends he was not the shooter, that he merely possessed a gun, and that he was merely present when Brooks shot the victims. In reviewing the sufficiency of the evidence in the context of habeas corpus proceedings challenging the judgment of a state court, a federal court's review is limited to determining whether, based upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 324 (1979).

25

The court's review of the evidence is conducted in the light most favorable to the verdict.  *Selvage v. Lynaugh,* 823 F.2d 845, 847 (5th Cir. 1987).

Applying the *Jackson* standard, the Second Court of Appeals addressed this claim as follows:

Appellant challenges the legal sufficiency of the evidence supporting his conviction.  The indictment alleges that Appellant intentionally caused the death of Antonio Marin by shooting him with a firearm in the course of committing or attempting to commit the offense of robbery of Antonio Marin or Ruben Marin.  The jury charge includes a charge on the law of parties.

Section 19.03(a) of the penal code provides in relevant part that "[a] person commits [capital murder] if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery."  Section 19.02(b)(1) of the penal code provides that a person commits murder if he "intentionally or knowingly causes the death of an individual."  Section 29.02 of the penal code provides in relevant part that a person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another."

Appellant contends that Brooks committed the offense and that he was just Brooks's pawn and has always maintained his innocence.  But Appellant's own statement is evidence that at a minimum, he agreed to be the getaway driver and then escalated his participation by entering the apartment carrying a loaded gun and by ushering the adult Marins into the bathroom after the robbery and shootings.  Applying the appropriate standard of review, we hold that the evidence is legally sufficient to support Appellant's conviction for capital murder.

Admin. R., Mem. Op., 7-8, ECF No. 13-5.[6]

---

[6]Petitioner also challenged the factual sufficiency of the evidence on direct appeal, however the factual sufficiency test is rooted in the Texas Constitution, and at one time, was followed by the Texas courts in reviewing the elements of an offense on appeal.  *Woods v. Cockrell,* 307 F.3d 353, 358 (5th Cir. 2002), *citing Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996).  The test requires more scrutiny than the federal constitutional standard set forth in *Jackson v. Virginia. Id.* at 357-58.  Federal courts do not apply the *Clewis* standard, which is based on Texas state law, in federal habeas review.  *Woods,* 307 F.3d at 358.  Moreover, the Texas Court of Criminal Appeals has overruled the factual sufficiency standard of *Clewis* and has held that the legal sufficiency standard, enumerated in *Jackson v. Virginia,* is applicable in determining whether the evidence is the sufficient to uphold each element of the offense.  *Brooks v. State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).  The claim regarding the factual sufficiency of the evidence is not cognizable in this § 2254 proceeding.

The state court's adjudication of the claim is not unreasonable nor is it contrary to or involve an unreasonable application of *Jackson*.  Neither the state appellate court nor this federal habeas court may weigh the credibility of the witnesses or reassess the weight of the competing lines of evidence presented to the jury.  "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith,* — U.S. —, 132 S. Ct. 2, 4 (2011).  Viewed in the light most favorable to the prosecution, the Court agrees that there was sufficient evidence to permit a reasonable jury to find Petitioner was a party to the offense and used a firearm during commission of the offense.  Petitioner is not entitled to relief under his fourth and eighth grounds.

### F.  Arrest Warrant

Finally, under his seventh ground, Petitioner claims the arrest warrant affidavit was improper. Pet. Attach. 24, ECF No. 1.  Petitioner neither challenged his arrest warrant affidavit prior to trial or on direct appeal.  Admin. R., Finding of Fact, 279, ECF No. 17-10.  Thus, the state habeas court expressly recommended denial of the claim on the basis that challenges to the validity of a warrant could not be considered for the first time on a writ of habeas corpus and challenges to the admission of evidence could not be raised on habeas corpus.  *Id.*, Conclusions of Law, 279, ECF No. 17-10. As previously noted, federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Coleman,* 501 U.S. at 729; *Amos,* 61 F.3d at 338.  To overcome the procedural bar, a petitioner must demonstrate either cause for the procedural default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice–*i.e.,* he is actually innocent of the offense for which he was convicted.  *Coleman,* 501 U.S.

27

at 750; *Finley,* 243 F.3d at 222-23.   Petitioner shows neither cause for failing to raise this claim

before trial or on direct appeal nor proof of actual innocence.   Therefore, this claim raised for the

first time in his state habeas application is procedurally barred from this Court's review.   Petitioner

is not entitled to relief under his seventh ground.

## V.  CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254 is **DENIED**.   Further, pursuant to 28 U.S.C. § 2253(c), for the reasons discussed

herein, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 30th day of January, 2015.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**